Our third case, 17-7049 Hamilton v. Northfield Insurance Company. Counsel. May it please the court, Chris Ledford here for Billy Hamilton. This is an appeal that arises out of a lawsuit resulting from an insurance claim on a metal roof. And here's the way I kind of look at this, your honor. The investigation of an insurance claim under Oklahoma law is not going like going to a buffet and you get to pick what you want to eat. You don't get to pick what facts as an insurance company you consider. This is more like maybe going back in days when you were a kid and you were at mom's house and you ate everything on the plate. You have to deal with what you're presented with. And your law, the 10 circuit law, sets that out. We know that when we file bad faith claims, the defendant is going to argue in a summary judgment motion in every single case, there was a legitimate dispute as to coverage, therefore there can be no bad faith. But the law in this circuit, Willis talks about it. It says you can't have a legitimate dispute argument if you didn't do an adequate investigation. And the Sims case talks about this adequate investigation. And the Sims case teaches that investigation is not adequate if one of two things happens. The manner of investigation hints at a sham defense or otherwise suggests that material facts were overlooked or the insurer intentionally disregarded undisputed facts supporting the insurance claim. That's exactly what happened here. There were two investigations, right, by the court field, right? There were. There were. The first one, home office sent out one of their field adjusters, a gentleman by the name of David Quarez. He's a traveler's employee. He's here. Was this after the claim or was this before the insurance was purchased? OK. If you're going back that far, there's the underwriting inspection. That was after the insurance was purchased. But before the claim, they checked out the roof before they. They checked out the roof and gave it a clean bill of health. If you look at that, that that underwriting inspection, I think it's an important component of the case. How long was that before the the company's first inspection? After the claim? Between the underwriting and. OK, let me give the timeline here. March, we we take out the insurance. May, they come out with their underwriters and do their underwriting inspection. June is our first notice of any leaking. And that's when my client, Mr. Hamilton, gets out there on the roof and notices raised screws, sees that crack on that overlap and does what he thinks is reasonable. He puts those screws down. They don't grip. He puts some tar on them. He re-tar seals that overlap and it works. And a few months go down the line and he gets notice again. Hey, it's leaking again. He goes back to him and his brothers and they do the same thing. And then in December is when he says, all right, I've got to file an insurance claim. It's after he files the claim in December that Travelers employee David Correz comes out and inspects. And my client tells him about all of the maintenance work, all of the things he had done in applying tar. And David Correz basically says, as you'll see in the record, he didn't believe him. And so he didn't put it in his report back to home office. And so that fact is not considered by David Correz or the home office adjuster. Claim gets denied. My client, Mr. Hamilton, calls and says, well, wait a minute. You're saying that I didn't adequately maintain this. Let me tell you what I did. And he talks with Curtis Lucky again, detailing what he did. Now, this is a factual dispute that I was raised to say that juries decide because Curtis Lucky will tell you that he doesn't recall him telling that. But my client says very emphatically, yes, I did tell him that. And juries decide those factual disputes, not judges. But he tells him all of those factors. And again, Curtis Lucky says he didn't, he never considered that factor. Mr. Hamilton gets a riffer. Riffer goes out and does the things that a riffer would do to look at it. He, he talks to Mr. Hamilton. He hears that evidence about what he had done. He gets on the roof. He uses his hand. He can move the metal up and down. And he says, this is metal. This is wind damage. Mr. Hamilton tells Mr. Lucky that. And they said, well, send us a letter. Well, Mr. Echols is a roofer. He's not an expert, professional expert witnesses. The only time he's testified as an expert, I suspect it will be the last. He's a roofer by trade, but he determined what it was. They get the letter. They do nothing with it. They hire instead, they don't go contact another roofer. They hire an engineer that's on their approved list. And this is where I think the whole industry, or at least this, this carrier has a problem. This is now we're coming to the second inspection. This will be the second inspection. They hire, um, Remkus and, and they, they spread this, this out, this, this responsibility, Curtis Lucky at home office tells David Kores out in the field, go hire an engineer and David Kores does his job, which was just a call on approved list, Remkus. And they do nothing to check to see whether or not Mr. France is qualified to do this. And in fact, I think the evidence is he's not, he's really a concrete floor expert. Um, but more importantly, your honors, they don't tell him this critical fact of here's what Mr. Hamilton had done. And when I got a chance finally to depose Mr. France, he acknowledged one, I didn't know those facts. And number two, those would be important facts because this isn't like there's 15 possible causes here. I mean, if you look at it, we, everybody agrees there were raised screws, that the water's coming in at that seal where it's cracked. The tar is not meant to hold in place. It's to, it's just to keep the seal. And if the metal's moving around, the seal is going to break. And, and so we, our conclusion, our expert, uh, is that wind caused that. They've got two. One is that they were, the screws on this roof, this roof's about 15 years old, everybody believes, were never screwed down to begin with, that somebody just went across the roof and left all these screws raised. Um, that makes no sense whatsoever. They don't have any evidence of that. Their underwriting, uh, inspection didn't say there's screws raised all over this roof that somebody's left, but the one that they really want to ride is that they were over torqued at the time of installation. Now I talked to that, that's Mr. France's ultimate conclusion. He knows he's got to come up with some conclusion that's not wind related. So he comes up with that one. And when I asked Mr. Quarries, why isn't Northfield entitled to rely on, on that conclusion? At least for purposes of your... Because they didn't give him all of the evidence. They didn't give him, he didn't have all the facts. They've got to get, just like you go to the buffet, you got to, you get to choose there, but when you're home, you got to eat it all. They got to give him all. They can't say here, just go, but we won't tell you some bad facts for us. They have to give him all of the information. And what's, what's the bad, what's the bad fact? The bad fact that he didn't consider that he acknowledges is important is that my client, Mr. Hamilton, twice got on that roof and applied that tar. And if you look at the testimony that Mr. Lucky, I had with him, I think it's probably the most important testimony in, in the case, and it's in multiple places, but if you go to the, to volume two of the appendix 359 to 365, it's, it's probably most succinct there. I could give you other places, but he initially, he, he ultimately conceived this idea that if it's moving, then we got, we got to figure out why it's moving. And the, but he never got to that point because neither he or Mr. Kores or Mr. France considered, Hey, something's moving. He's putting this tar on there and it's cracking again. Tar is meant to last, this mastic or tar is meant to last much longer than six months. And we see that it's moving because it's cracked. We got to find out. And he acknowledges at the end of that little section, I never got to that point because I didn't consider his maintenance. Your Honor, I'd like to move on if I can to the fee issue. Just, just this fee issue really is, it goes beyond this case. The way the district court handled this fee issue is unlike anything I've ever seen. This is a situation where the day after he granted summary judgment, we appeared for a pretrial and at that pretrial conference, he was trying to encourage the parties to resolve the case. And he looked at defense counsel and said, you know, Mr. Lefferts is going to get fees. You guys need to talk about resolving this. And then we leave that. That's what leads in. That's the context that leads into this, these negotiations and their email where they made the offer expressly references attorney fees and costs. It's in there. The old score. They're not quantified, are they? They are not quantified. But the $45,000 offer. It's, it's a, it's for everything. I don't get the appeal. I give it all up. I vaguely remember doing that. Huh? I vaguely remember doing that before this job. Okay. But it's, it's, it's the whole thing. And it's expressly references. The old case is a case that looked at this statute, looked at how do, how are we going to evaluate this and says, you know, if it, if it considers fees and costs, if it mentions them, we're going to put those fees and costs up to the date of the offer in comparing and deciding who's prevailing party. In old's though, the expressly, it doesn't. It's just saying, we're going to give you coverage and we're going to pay these back hospital bills. And so they said here, we're not going to apply that. But if it mentions costs, we will apply it. At the district court level, even Northfield agreed that that's the way it ought to be. Now that we're up here, they're saying, well, that was a misapplication. It was dicta. Old's is the right rule and it ought to be applied here so that we can recover as we should our attorney fees. I'll reserve a balance of my time. You may. So are both of you going to argue? Yes, Your Honor. All right. You're Mr. Downs? Yes, sir. May it please the court. Your Honor, along with my colleague, Jacob Daniel, I'm here on behalf of Northfield Insurance Company. After all that sound and fury, I need to kind of catch my breath here and so forth, I just simply tell the court that every contention that counsel made, every criticism that he has made against my client, Northfield Insurance Company, even if you assume all that's true and accurate, which we don't concede that, but even if you did, that would simply be an indication that there was negligence. And under Oklahoma law, under Bedillo, negligence does not rise to the level necessary to commit bad faith here. Some of the facts that need to be... Well, you have to undertake a reasonable investigation before you deny coverage. Why isn't it a fact question that your investigation was unreasonable because you failed to disclose material facts to your inspectors? Well, because as the court had noted, let me quote the Judge White's specific comment in his order. This matter is the quintessential case of a simple dispute over whether a claim is covered under an insurance policy. He goes on to cite Harris v. Progressive Direct Insurance Company, which this court has just recently affirmed on appeal, that nothing in the law requires an insurer to investigate a claim exhaustively or to faultlessly degree of accuracy. Rather, the investigation only needs to be reasonable under the circumstances. In this case, what happened? Is that Mr. Hamilton bought an old, for lack of a better term, dilapidated type of convenience store out in rural Oklahoma. But that doesn't really matter because the roof was passed on by the underwriter when they insured it. And that was the point I was coming to, Your Honor. The underwriter, when examining the convenience store, that underwriting was a $150 inspection. It was not a thorough inspection where they went into the attic and checked deflection of beams or anything else. It was literally a $150 inspection by a third-party company. It's essentially showing up at the scene of the building and making sure it's all there, for lack of a better term. So I want to make sure the court's aware the underwriting that counsel has spoken about certainly did, in fact, occur. But I think a $150 inspection fee speaks for itself as far as the thoroughness. But at cost, nobody memorialized any obvious damage at the time of underwriting. I'm sorry, Your Honor? There was no evidence of poor maintenance at the time of underwriting. Well, actually there was, Your Honor. The parking lot was in a state of total disrepair. Well, we're not talking about the parking lot. We're talking about the room. Well, the building itself had graffiti, profane graffiti, I might add, spray painted on the side of the building. It had broken windows in the back, which Mr. Hamilton never repaired, even during the pendency of this claim. So, again, the convenience store building itself was not pristine. I just think it goes well to give an example of how well this convenience store was maintained before Mr. Hamilton had purchased it. Right. But the purpose is, I mean, the insurer won't write the coverage unless someone goes out and gives it this inspection. And if they write back and say, oh, this thing's got all kinds of problems on it and lists them out, then they're going to exclude those things. So they don't get a claim two weeks later. That's correct, Your Honor. And ultimately that happened in this case. And that's why the convenience store and Mr. Hamilton were not renewed in the future because they had given him a list of repairs to perform and he had not performed those. Right. I guess my point is, it's not fair to criticize them for relying on the underwriter if your client did too. Go ahead. With respect to the actual investigation of this claim, I think it needs to be noted that Mr. Hamilton is an experienced insurance adjuster of years. There is certainly no indication that he had a lack of training or otherwise was incompetent. Mr. Luckey similarly had practiced insurance claims adjusting his entire career, except for a stint while he was in the Marine Corps. But he's a college graduate. There's certainly no indication that Mr. Luckey in the past has had any type of sanctions imposed by him by any type of government licensure authority. What Mr. Luckey did is he has Mr. Queros, who is an outside claims adjuster, to conduct this examination of the actual convenience store. He gets up on the roof, does a thorough examination, takes Bucu photographs, creates a very detailed report, provides that report along with the photographs to Mr. Luckey. Mr. Luckey examines the photographs on his own as well. They do not find any evidence of storm-related damage to the metal roof. And the hallmark, which was testified in evidence in this case, is metal deformation. It's almost common sense that if you have a metal roof and you're contending that wind damaged the metal roof, it's going to have some creases in it, it's going to have some bends, it's going to have some curling around the edges, there's going to be some sort of metal deformation. Now, I don't want to spend a lot of time on the screws and the over-torquing and so forth, but the evidence will, in the record, supports the situation that these screws were basically straight up. There can be other manners in which the screws will pop up, just the heat and code contraction will make the screws work up and pop up and so forth. So there's different reasons why that can occur. Now, Mr. Ledford made the point that your inspector was not told about Hamilton's prior repairs of the roof and that that was a material fact that a reasonable inspector would have wanted to know. What's your response to that? Are you referring to the engineer? I'm referring to his claim that your inspectors weren't told the full story. I guess we're going back to buffets and mom's dinner now. I think that he's referencing the Remkes engineer, Tim France, that we did not tell Tim France about anything with respect to the maintenance issues, etc. And there's a good reason for it. Remkes Engineering is an independent engineering company. We do not want to be accused of trying to push them in any certain manner. So we send them out there and tell them, here's the issue. Is there wind damage to the metal roof? And let them come to their own conclusions. Now, it needs to be said, when Tim France was out there doing his investigation, he wasn't operating in a vacuum. Mr. Hamilton's roofer, Mr. Echols, was also there. Mr. Echols testified that Mr. France was polite, professional, and in his opinion, did a very thorough job of inspecting it. So to be clear, Your Honor, if Mr. Lucky had wanted to cheat Mr. Hamilton out of his $10,000 insurance claim here, why would he go to the trouble of hiring an independent engineering firm and pay them thousands of dollars to conduct another examination? The reason why he did that was not to deny the claim. He was trying to find a way to pay the claim. I would simply end with the situation being that my client takes its responsibilities to its insurers seriously. We tried to do what was right in this case. We had a disagreement with Mr. Hamilton. That's a breach of contract. It's not the extraordinary remedy of a bad faith cause of action. Judge White made the correct decision in granting summary judgment on that issue. I will cede the remainder of my time to Mr. Daniel to talk about the attorney's fees. Welcome. May it please the court. My name is Jacob Daniel and I also represent Northfield Insurance and I am going to talk about the attorney's fees issue. So Oklahoma follows the American rule like many jurisdictions, whether it's not a fee case, unless there's a specific reason it is a fee case. In this situation, it's Oklahoma statute title 36, section 3629. And as this court is probably aware, 3629 says that insured is a prevailing party and therefore entitled to attorney's fees in interest if the favorable judgment he receives or she receives exceeds a written sum and offer from an insurer. Now what the appellate wants this court to do is rule that he is able to use his attorney's fees to add to the $10,000 or so judgment he received for his contract claim in order to then beat Northfield's $45,000 offer. Without his attorney's fees added as it stands right now, Hamilton cannot beat Northfield's offer. Doesn't should Olds direct us to add the attorney's fees? I don't believe so because if you look at Olds, it says that the plaintiff's in Olds makes the argument that fees should be included if the offer contemplates it. But it says, well, that's not really even an issue here. The argument doesn't really matter because the offer doesn't even contemplate fees. So we don't even need to reach that argument. So I believe that section in Olds is dicta. Also the case relied upon in Olds references another statute. It's not this statute. And aren't the offer, for purposes of analysis, aren't the offers in Olds and in this case, materially similar? I don't, I mean, I would agree, Your Honor, in the fact that there's not an expressed reference to fees, contemplation of fees, if that's what you're referring to. And I wanted to... This one did mention fees though. Yes. And Judge White acknowledged that it made some fees. And if you look at the text of the offer, and I can't remember the exact verbiage off the top of my head, it goes on to say that this offer is three times for your contract damages and you can pull up some fees and costs of this. And Judge White made a factual determination that the offer did not fully contemplate fees. And so he ruled, applying the Olds rule, if you look at his order, he actually does apply Olds and says that, no, I don't believe that this offer contemplated. And so that is a factual determination by Judge White. Is it your position that for an offer to contemplate fees, it would have to spell out a specific amount of fees it was to cover? Possibly, Your Honor. I think that's definitely in a way. I would just look at Olds. If you're going to look at Olds, essentially what the Olds logically says is that if you chose to follow that rule, then you have to start with the position that the default rule is that you don't contemplate fees. So if a trial judge looks at it and isn't convinced that it does contemplate fees, then under the Olds rule, if you're going to apply that, then it doesn't contemplate fees. So the judge has to perform his own factual determination. This is similar under the same statute in this case called Oklahoma County or Association of County Commissioners of Oklahoma versus National American Insurance, where the Oklahoma Court of Civil Appeals sent it back down and because they wanted the trial court to look at an offer of proof under the same context, but when they re-appealed it under the offer of proof, the Oklahoma Court of Civil Appeals said this is a factual determination. And I wanted to get to one point is that if you follow the Olds dicta, but essentially the appellate wants you to do is take the fees that he wants, let's say $120,000, and add it to his contract claim to then defeat it. There's a problem with this because the judge at this point hasn't determined whether those fees are reasonable or not. He just has to accept that the plaintiff attorney billed $120,000. Okay, if this court was to say, okay, you're entitled to your fees, add the $120,000 on, then this court would send it back down to the district court. The district court could say, you know what, you only won a $10,000 contract claim, proportionality and other reasons apply. I'm only going to award you $30,000. Let's say the judge awards $30,000. Okay, $30,000 plus the $10,000 or so contract claim doesn't beat Northfield's offer, so he's went through this exercise of looking at the reasonableness just to find that the appellant wasn't even entitled to the fees anyway. So essentially, you would have to, the judge would have to look into the reasonableness and amount of fees before seeing whether the appellant is entitled to them, and that doesn't make sense. So I'm concerned that, I mean, I think you are edging this into a direction where people, if they wanted to include fees, would have to specifically enumerate the amount of fees that they were going to put in, and one of the things that tends to rub clients the wrong way is that they're going to enrich the other side's attorney with the settlement's offer, and so it seems to me it's been common practice for people to make these global offers, saying, I know you think you're entitled to fees, and that you think you're going to get some costs, plus you have your damages, so we're not going to get into how much, because most people don't want to argue about what the fees are either. So they'll say, we'll give you $45,000, and that's for everything. You just deal with it. So would that, I mean, if I had a case with you and I said, hey, I know you want some fees, I'm not going to get into how much you've earned, I'll give you $45,000 for everything, fees, costs, everything, is that good enough? I don't think so, because Olds, if you look at it, it doesn't say it outright, but it appears logically that a straight offer does not qualify. Because when you make a straight offer, fees could be one reason, but another reason can be a business decision by the client. It can be, we don't want to go through the cost of litigation. I see my time is up, if I can just finish. It can be the cost of litigation. There are a multitude of reasons why you would do a lump sum offer. And just because, as Judge White found, describing it as, oh, you can have some of your attorneys fees compensated, describes the reasonableness of the offer, and that's Judge White's factual determination to stand. Thank you. Thank you, counsel. I'll start out with the fee issue. If Judge White's order is allowed to stand, it effectively will end our ability to question insurance coverage denials, because it will be a playbook now for the insurance companies to litigate these claims, force us to jump through all the hoops that you're required to when you litigate one of these claims and do it effectively. And right before trial, they'll make an offer that's just maybe a dollar, $10, or if they want to be safe, it'll be $100 or $200, more than the contract claim, and cut off our ability to recover attorney fees. If you look at the purpose of 3629, it was to protect insurers. It was to give the regular folks an ability to hire a lawyer to go after a big insurance company. This sort of interpretation will not hurt an insurance company. They've got plenty of money to file deck actions and hire lawyers and pay them by the hour. But this will hurt the common ordinary man's ability to challenge an insurance company's decision. Off the top of your head, is there an Oklahoma case that sort of carries that forward, this idea that you're going to broadly construe these types of statutes to carry out the purpose of allowing people to bring claims? Well, I think that the two cases that I cited in my brief, I believe Stoth is a Tenth Circuit case. It's on page 22 of my reply. And Canal is an unpublished case from the Northern District that I think does a good job talking about these issues and laying that out. I think they both deal with that issue. I want to quickly address this. Well, it was just negligence. It was not just negligence. It was not to simply disregard undisputed facts that were favorable to a finding of coverage. Not once, but twice. It was not simple negligence to hire an outside consultant, do nothing to determine whether or not they're really qualified to do this job. Just say they're on the approved list so we can use them and then not give them the important facts that are undisputed, that are favorable to a finding of coverage. It is not simple negligence to not even look at your own underwriting inspection report and take the information from that and evaluating it in determining coverage. It is not simply negligence to use a creased metal requirement that's not found anywhere in your policy and say, if you don't have creased metal, then you don't have a wind damage claim. If that were the case, they should tell us that and we'll let that metal move until it creases. It would favor Mr. Hamilton not going up there and being proactive. If he had just waited, it eventually would have peeled back and they would have provided coverage. They went to a lot of trouble to, and they spent a lot of money on outside experts for the purpose of denying a $10,000 claim. I don't think they went through a lot of trouble. I mean, David Kors is an inside person. I mean, he's with Travelers. They didn't spend any money on him. The only person they hired. They didn't have a duty to do a second inspection, did they? They could have stood on it. We would have still sued them because they didn't evaluate the claim. They didn't evaluate all of the facts. They just check boxes here. It's not my job to figure this out. I have him go hire him. Nobody checks to see a France, knows what he's doing. They don't give him all the evidence. And that's just not good faith. What's the evidence that the adjusters didn't know what they were doing with respect to steel roofs? David Kors, his testimony is that he's installed one metal roof and even he knows you can't, you can figure out real quick how to install those and torque that and not all over the roof over Torcum, which was France's. So that's in the record? That's in the record. David, Curtis Lucky, he's never been on a metal roof in his life. Never installed one. All he knows is what they've taught him. And it's important. You'll find this in the record. Although they say we've got to have creased metal in order to have a claim that's covered, if you go back and you look at the traveler's training, which Curtis Lucky acknowledged he'd never seen, and that is volume 9679, even traveler's training and their confidential training that they loosen or pull screws as well as bend. And that's what we had here, but they wouldn't, that's not the way they do this, you've got to have creased metal. So, all right, counsel, I think we understand your argument. Your time's expired. Counsel will be excused and the case shall be submitted. The court's going to take a recess for a few minutes.